## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

ROBERT BRIGGS,

          Plaintiff,

   v.

MARRIOTT INTERNATIONAL, INC.,
*et al.,*

          Defendants.

Civil Action No.  AW-04-3427

---

## MEMORANDUM OPINION

This action is brought by Plaintiff Robert Briggs ("Plaintiff" or "Briggs") to recover benefits under

the terms of a Long Term Disability ("LTD") policy issued by Defendant Liberty Life Assurance Company

of Boston ("Liberty"), on behalf of Defendant Marriott International, Inc. ("Marriott") (collectively,

"Defendants"), pursuant to the civil enforcement provisions of the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1332(e).  Defendants removed this action from the Circuit Court for

Montgomery County, Maryland to this Court.  Currently before the Court are the following motions of

Defendants:  Motion for Summary Judgment [10]; Motion to Seal Exhibits [11];[1] and Motion for Leave

to Submit One Paper Copy of Exhibits [12].[2]  These motions have been fully briefed and are ripe for

---

[1] Defendants move to Seal Exhibits relating to Liberty's claim file for Plaintiff's long-term disability benefits claim which includes personal and medical information related to Plaintiff.  The Court has reviewed the aforementioned uncontested motion, and hereby grants Defendants' Motion to Seal Exhibits.

[2] Defendants also move for leave to submit one paper copy of exhibits.  The Court notes that Defendants have already submitted two paper copies of exhibits to this Court, and therefore Defendants' Motion for Leave to Submit One Paper Copy of Exhibits is hereby denied-as-moot.

consideration.  No hearing is deemed necessary.  See Local Rule 105.6 (D. Md. 2004).   For the reasons

that follow, Defendants' motions are granted in part, and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant.  Briggs was employed

by Marriott for over 20 years, and, at the time of this action he served as a Senior Information Systems

("SIS") Analyst.  As a SIS Analyst, Briggs maintained and developed a computer system that served the

WorldWide Reservation Center for Marriott.  Although his job included various tasks, Briggs's main duties

were to sit at a computer terminal and enter program data continuously for up to 3-4 hours without a break.

Briggs has a history of chronic lower back and leg pain which originated in 1989 when Briggs

developed a herniated disc.  In 1991 and again in 1997, Briggs underwent surgery on his lower back to

cure his deteriorating spinal condition.  Following each surgery, Briggs continued to develop pain in his

lower back and left leg.  On February 8, 2000, Dr. Rosita Dee ("Dr. Dee"), a neurologist, conducted a

nerve conduction study of Briggs's lower spine and legs.  Dr. Dee found that Briggs was suffering from

nerve damage emanating from his lower back, which caused pain in both of his legs.  In addition to his

spinal condition, in January 2002, Briggs suffered a myocardial infraction which resulted in an angioplasty

of his right coronary artery.  Although after the 1997 surgery Mariott allowed Briggs to work at home as

part of its telecommuting program, the telecommuting program was disbanded in 2002, and Briggs

subsequently returned to full-time work at Marriott.

Based on his medical condition, Briggs applied for LTD benefits provided by Marriott pursuant to

its Liberty Group Disability Income Policy (the "Policy").  The Policy was issued to Marriott by Liberty,

which was both the administrator and insurer of the Policy, for the purpose of providing disability benefits

to its eligible employees.  In order to be eligible for LTD benefits, a covered person must be considered "Disabled" or meet the Policy's definition of "Disability."  Briggs's date of disability was September 20, 2002.  Briggs's LTD benefits took effect on March 21, 2003, and were paid for nearly one year before being terminated on March 5, 2004.

On September 26, 2002, Briggs filed a claim for Short Term Disability ("STD") benefits, and Liberty began collecting medical records from Briggs's health care providers.  On October 21, 2002, Liberty received a communication from Dr. Michael Anchors ("Dr. Anchors"), Briggs's primary care physician.  Dr. Anchors informed Liberty that Briggs had "Class 5 physical impairments," which was defined as a "severe limitation of functional capacity, incapable of minimum activity."  Dr. Anchors further informed Liberty that Briggs was unable to stand erect due to back pain and required daily opiates to control the pain.  In a note dated October 29, 2002, William Mudrick ("Nurse Mudrick") acknowledged that Briggs had not only a heart condition, but was also diabetic.

On November 1, 2002, Liberty received a "physical job evaluation form" from Marriott that was completed by Briggs's supervisor Jeff Newman ("Newman").  Newman indicated that the physical requirements of a SIS analyst included 4 ½ hours of sitting, 1 hour of standing, and 1 hour of walking.  Newman also indicated that, although Briggs exhibited signs that his physical condition was deteriorating, Mariott needed a person to perform the functions of a SIS analyst on a full-time basis, and that Briggs had been provided a special "zero gravity" ergonomic chair to assist him at work.

Liberty also sent a "Restrictions Form" to Dr. Anchors,  requesting that he provide Liberty with a diagnosis of Briggs's current condition and a description of any restrictions or limitations.  On December 4, 2002, Dr. Anchors responded to Liberty.  Dr. Anchors indicated that Briggs had coronary artery disease

and severe chronic law back disease.  Dr. Anchors described Briggs's condition as "totally disabled."  On January 22, 2003, a second physician, Dr. Brett Quigley ("Dr. Quigley"), responded to Liberty's request for medical records.  Dr. Quigley diagnosed Briggs with back pain and with a secondary diagnosis of pseudoarthrosis.  Dr. Quigley also indicated that Briggs suffered from Class 5 physical impairments and recommended that Briggs "cannot return [to work] in his condition."

On February 26, 2003, Nurse Mudrick decided to schedule a Functional Capacity Evaluation ("FCE").  Liberty requested that Briggs discontinue all pain medication prior to the FCE.  In preparation for the FCE, Liberty conducted videotaped surveillance on Briggs at various intervals from April 14, 2003 to May 3, 2003, to clarify Briggs' functional capacity.  Investigators observed Briggs walking with and without a cane, entering and exiting his vehicle, driving with a child in his vehicle, carrying various items including a trash bag, opening the hood of his vehicle, and leaning forward to check his oil.  Dr. Anchors, however, prohibited Briggs from discontinuing his pain medication, and Liberty subsequently cancelled the FCE.

On May 19, 2003, Briggs responded to Liberty's request to complete an "Activities Questionnaire."  In his response, Briggs admitted that he could sit a maximum of 15-20 minutes and walk for a maximum of 5-7 minutes, but stated that he suffered "constant pain with [his] back and the quantity of pain medication . . . interferes with [his] ability to concentrate in complex tasks."  Briggs also stated that his "[i]nability to sit or stand for prolonged periods makes it difficult to accomplish much work."  Additionally, Briggs stated that he was also experiencing memory and concentration problems due to back pain and the medication he consumed.

Liberty ultimately requested Briggs to undergo an Independent Medical Examination ("IME").  On

4

May 27, 2003, an IME was conducted on Briggs by Dr. Michael April ("Dr. April").  In his conclusions,

Dr. April acknowledged that Briggs is "limited functionally" but found that "[a]t this time, Mr. Briggs does

have a sedentary functional capacity."  Liberty requested that Dr. Anchors, Briggs's primary physician,

respond to Dr. April's IME report.  In response, Dr. Anchors noted three "mistakes" with the IME report:

(1) that the date of Briggs's myocardial infarction was 2002, not 2001; (2) that Briggs did not refuse to

take a higher dose of Oxycontin; and (3) that no reasonable surgical option existed to relieve Briggs's back

pain.  Of the three mistakes noted, Dr. Anchors did not comment on Dr. April's conclusions that Briggs

had a sedentary functional capacity.

Liberty requested that Dale Plourde ("Plourde"), an outside vocational consultant, review Briggs's

file for an assessment of the physical requirements of Briggs's SIS analyst position.  Plourde concluded that

Brigg's SIS analyst position was sedentary in nature.  On August 21, 2003, Liberty denied Brigg's claim

for LTD benefits.  The denial letter discussed in detail the IME and Dr. Anchors's response, stating in

pertinent part:

> Although Dr. Anchors clarified the above information, he did not comment on you having
> sedentary functional capacity or provide any medical documentation or otherwise.
> Therefore, we must assume that he agrees with all aspects of the IME results, which
> includes that you have sedentary functional capacity.
>
> Your occupation as a senior systems analyst requires that you sit for four hours and 30
> minutes, stand one hour and walk one hour, reach above shoulder level 30 minutes, and
> reach at shoulder level for one hour.  There is no lifting required, which is considered
> sedentary as performed in the national economy.
>
> Based on the medical information in relation to your occupation requirements, you are able
> to perform the duties of your Own Occupation.  Therefore, you do not meet your policy's
> definition of disability, and we must close your claim as of August 22, 2003.

On August 25, 2003, Dr. Anchors wrote to Liberty to voice his disagreement with the IME's

assessment of Briggs's sedentary functional capacity.  Liberty subsequently reopened Briggs's claim,

requested additional information regarding Briggs's condition, and allowed Briggs to continue to receive

benefits during the review.  Nurse McCormack reviewed the additional records collected from various

health care providers that Briggs had consulted.  Due to the conflicting opinions from medical doctors in

the file, as to whether Briggs had full time sedentary capacity, Nurse McCormack and Plourde agreed to

send the file for a peer review by an orthopedic surgeon.

On March 3, 2004, Liberty obtained a review of Briggs's medical records by Dr. Richard A. Silver

("Dr. Silver"), an independent peer reviewer.  Based on his review of the file, Dr. Silver concluded:

> Mr. Briggs is not capable of performing activities consistent with a light or heavy work
> capacity.  Mr. Briggs is, however, capable of a sedentary job with frequent position
> changes.  By his own admission in May of 2003, he can [sit] 15-20 minutes, stand 15-20
> minutes, and walk 5-10 minutes.  With work modifications at his work station, he certainly
> could be functional in a sedentary capacity as a senior system analyst for Marriott. . .

On March 9, 2004, Liberty denied Briggs's claim for LTD benefits.  Liberty concluded that, under

Marriott's LTD policy, Briggs did not meet the definition of disability and therefore he was ineligible to

receive disability benefits.  In so concluding, Liberty relied on the following factors:  (1) medical

documentation from Briggs's treating providers; (2) surveillance conducted to clarify Briggs's functional

capacity; (3) Dr. April's Independent Medical Exam of Briggs.  Liberty also found it significant that Dr.

Anchors received a copy of Dr. April's report for his review and comment, and, in his response, Dr.

Anchors did not comment on Briggs's functional capacity.  Based on these factors, Liberty found that

Briggs had a sedentary functional capacity which rendered Briggs capable of performing the duties of a SIS

analyst.

Liberty provided Briggs an opportunity to submit any additional medical information to support

his disability for appeal review.  On May 19, 2004, Briggs requested an appeal of Liberty's denial of his

LTD claim.  However, Briggs did not provide any additional medical documentation on appeal.  On July

12, 2004, Liberty upheld its decision to deny LTD benefits to Briggs.

Plaintiff filed this action in the Circuit Court for Montgomery County, Maryland, alleging that

Defendants' denial of his long term disability benefits is a breach of contract and a breach of federal ERISA

law pursuant to 29 U.S.C. § 1332.  On October 22, 2004, Defendants removed this action to this Court

on the basis that Plaintiff's claim for disability benefits was brought under the federal ERISA statute.  On

October 29, 2004, Defendants moved for summary judgment.  Defendants' motion is ripe, and an opinion

is now issued.

## DISCUSSION

A.      Summary Judgment Principles

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other

proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus

entitling the moving party to judgment as a matter of law.  See *Fed. R. Civ. P. 56(c)*; Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986).  For a party's evidence to raise a genuine issue of material fact to

avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether to grant a

motion for summary judgment, the court must view the record in the light most favorable to the non-moving

party.  Id. at 255.

B.      Applicable ERISA Principles

In determining the standard of review for a denial of benefits under ERISA, a court must first decide

whether the language of the plan grants the plan administrator discretion to determine the claimant's eligibility for benefits.  Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268 (4th Cir. 2002). If the plan confers discretion, the court reviews the decision to deny benefits for abuse of discretion.  Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).  Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.  Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). Such a decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  Id. (internal quotations omitted).  In the present cases, Briggs concedes that the Policy gives Liberty discretionary authority to make eligibility determinations,[3] thus triggering an abuse of discretion standard.

In support of his claim, Briggs contends that Liberty, acting as both the decision-maker and insurer of the policy, has an inherent conflict of interest when it denied him benefits.[4]  Briggs alleges that any

---

[3] Even the plain language of the Policy expressly grants Liberty the sole decision making authority over interpretation of the Policy and eligibility for disability benefits.  Section 7 of the provides, *inter alia*:

> Liberty shall possess the authority, in its sole absolute and final discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

[4] Briggs also suggests that he is entitled to discovery prior to this Court's disposition of Defendants' summary judgment motion.  The Court notes that, due to the deferential standard of review in ERISA cases, discovery would be entirely unnecessary on the merits of Liberty's decision as this Court's review of the administrator's decision should be based on the record before the administrator. See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994).  Even assuming discovery is necessary, Briggs has failed to specify the discovery that he believes is necessary. Therefore, this claim lacks merit.

disability payments would be made by Liberty, and therefore, the decision to deny benefits has a direct financial effect on the profitability of the company. Briggs correctly notes that, because Liberty is both the Policy's decision-maker and insurer, the abuse of discretion standard must be modified to reflect this potential conflict of interest.

The Fourth Circuit has established "a well-developed framework" for consideration by a reviewing court of the potential conflict of interest existing here. Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997); see also DiCamillo v. Liberty Life Assurance Co., 287 F.Supp.2d 616, 622 (D. Md. 2003) (stating that "a 'modified' abuse of discretion standard applies because of the potential conflict of interest arising from Liberty Life's dual role as decision-maker and insurer"); Thomas v. Liberty Life Assurance Co., 226 F.Supp.2d 735, 741 (D. Md. 2002) (stating that, when a defendant's exercise of discretion "had a direct financial effect on its profitability," the modified abuse of discretion standard applies). Specifically, the Fourth Circuit has recognized that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" Elliott, 190 F.3d at 605 (internal citations omitted); see also Bailey v. Blue Cross and Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995), cert. denied, 516 U.S. 1159 (1996) (stating that if a conflict of interest exists under ERISA, "the fiduciary will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict"); Ellis, 126 F.3d at 233 (stating that if a conflict of interest exists under ERISA, a court should not deviate from the abuse of discretion standard, rather "the court modifies that abuse of discretion standard according to a sliding scale"). A court must apply the conflict of interest factor on a case-by-case basis, deviating from the usual abuse of discretion standard of review "only to the extent

9

necessary to counteract any influence unduly resulting from the conflict."   <u>Ellis</u>, 126 F.3d at 233.

Applying these principles, this Court must determine on the record before it whether Liberty's decision was based on substantial evidence and whether its review process was thorough and evinced a deliberate, principled reasoning process.   <u>Id.</u> at 234.   Presented with a potential conflict of interest, this Court should also review the merits of Liberty's decision to deny Briggs benefits to determine whether that decision was consistent with an exercise of discretion by an administrator, acting free of the interests which would conflict with those of the beneficiary.   <u>Id.</u> at 233.

C.      Analysis of Liberty's Claim to Summary Judgment

Liberty's decision was clearly based on a deliberate and principled reasoning process.   The claim file which formed the basis of Liberty's decision contains over 500 pages of medical records, questionnaires filed out by various physicians, questionnaires completed by Briggs, and other miscellaneous records. Liberty spent well over a year collecting medical reports from Briggs's health care providers.   Liberty also conducted videotaped surveillance to clarify Briggs's functional capacity.   Liberty sought to obtain a FCE of Briggs, but was unable to do so due to the objections raised by Briggs's treating physician.   Prior to denying Briggs benefits, Liberty commissioned an IEM of Briggs and sent the results of the IME to Dr. Anchors, Briggs's primary physician, for review and comment.   When Dr. Anchors questioned the conclusions of the IME regarding Briggs's functional capacities, Liberty on its own initiative reconsidered its initial denial of Briggs's claim.   At the time of its decision to deny Briggs's claim, Liberty had before it medical records of the physicians who had examined Briggs, and even referred Briggs's file to an outside vocational consultant for review.   Finally, in reviewing Briggs's claim, Liberty obtained an independent peer

review of Briggs's case file by a board certified orthopedic surgeon.[5]

Moreover, Liberty's decision was based on substantial evidence.  In denying Briggs's claim, Liberty decided that Briggs was not disabled as defined by the Policy.  The Policy defines Disability as:

> during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

> After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity.

As a SIS Analyst, Briggs was required to sit for four hours and 30 minutes, stand one hour, and walk one hour, reach above shoulder level 30 minutes, and reach at shoulder level for one hour.  A vocational analysis was conducted to determine the capacity required to perform as a SIS Analyst, and the vocational analysis concluded that because there is no lifting requirement for a SIS Analyst; it is a sedentary occupation as performed in the national economy.  Based on the information in the case file and the occupational requirements of Briggs's position, Liberty concluded that Briggs was able to perform the duties of a SIS Analyst.

In making its decision that Briggs was not disabled under the Policy, Liberty relied in part upon the medical judgments of an independent medical examiner and an outside board certified peer reviewer.  In the opinion of Dr. April, the independent medical examiner, Briggs was capable of performing sedentary

_____

[5] In cases where a plan administrator is acting under a conflict of interest, this Court has noted that failure to request an independent medical examination or conduct an independent review of the claimant's medical records is particularly significant in finding that the plan administrator abused its discretion.  DiCamillo v. Liberty Life Assur., 287 F.Supp.2d 616, 623 n.3 (D. Md. 2003) (citing Laser v. Provident Life & Accident Ins. Co., 211 F.Supp.2d 645, 650 (D. Md. 2002)).

work.[6]  Following a physical examination of Briggs, Dr. April's impressions were that Briggs's lifting and carrying capacity should be limited to 10 pounds.  Dr. Silver, the peer reviewer, concluded that "[w]ith work modifications at his work station, he certainly could be functional in a sedentary capacity as a [SIS Analyst]".[7]  In relation to Briggs's ability to work, Dr. Silver found that Briggs "is not capable of performing activities consistent with a light or heavy work capacity."  Nevertheless, Dr. Silver found that Briggs "can sit 15-20 minutes, stand 15-20 minutes, and walk 5-10 minutes" and, with work modifications, Briggs could "certainly" be functional in a sedentary capacity as a SIS Analyst.  In support of his diagnosis, Dr. Silver reviewed objective evidence, such as a CT Scan of Briggs's lumbar spine, a Lumbosacral myelogram, X-rays, and an MRI.  Dr. Silver concluded that:

> The objective evidence is not consistent with Mr. Briggs's subjective complaints.  The information provided shows no true loss of functionality in lumbrosacral spine, no true loss of functionality or focal neurological deficits in the lower extremities, and the findings roentgenographically is such of a minor-to-moderate nature that *without true documented objective evidence, these findings would not be significant enough to preclude Mr. Briggs from being gainfully employed in a sedentary capacity.*

Briggs argues that the three physicians who treated him arrived at different conclusions than the independent medical examiner and outside board-certified peer reviewer.  Instead of objective evidence, such as x-rays, to support his subjective complaints, Briggs relies principally upon the diagnosis of his three treating physicians:  Dr. Anchors; Dr. Lauerman; and Dr. Quigley.  The record shows that Briggs's medical

---

[6] Briggs also challenges Dr. April's conclusions on the grounds that Dr. April was not supplied with medical records to review.  The record, however, shows that Liberty transmitted a complete copy of Briggs's medical records to Dr. April prior to his IME.  Additionally, it is apparent from the text of Dr. April's IME report that he reviewed the medical records.  Thus, Briggs's challenge has no merit.

[7] Briggs also posits that Liberty failed to take his mental condition into account.  The record, however, shows that Dr. Silver addressed the issue and noted that there were no psychiatric and/or psychological consultations noted in the medical records.  Thus, this claim lacks merit.

history, physical examinations, and testing support the treating physicians' diagnosis of Briggs's *physical condition*. Nevertheless, none of the physicians upon whom Briggs relies have provided objective evidence that Briggs's physical condition *precludes* him from performing sedentary duties.

On August 10, 2001, Dr. Lauerman reported an episodic pain related diagnosis for Briggs, but in concluding that Briggs's pain was "functionally incapacitating," Dr. Lauerman admitted that X-ray reports sufficient to support this diagnosis had not been performed. On September 12, 2001, after such X-rays were taken, Dr. Lauerman reviewed X-rays and the MRI, and concluded that Briggs has "advanced discogenic changes at L2-3". On this visit, however, Dr. Lauerman made no clinical findings that Briggs's discogenic changes rendered him functionally incapacitated or unable to perform sedentary duties. Dr. Quigley's reply to Liberty's physician statement diagnosed that Briggs suffered from a class 5 physical impairment, without ever providing any objective medical evidence to support this conclusion.[8]

In the absence of objective evidence, it was reasonable for Liberty to rely upon the opinions of Dr. April and Dr. Silver. Those physicians diagnosis, unlike those of Briggs's treating physicians, were based upon examinations evaluating whether Briggs was able to perform the tasks associated with his occupation or any other occupation. Most importantly, Dr. Silver's diagnosis, following a review of objective evidence, concluded that, with modifications, Briggs was capable of performing as a SIS Analyst. This determination undercuts the conclusions of Briggs's treating physicians which, failed to consider whether Briggs was capable of performing sedentary activities, and did not rely upon objective evidence to support

---

[8] Briggs points out that Dr. Quigley's January 22, 2003, response to Liberty's physician statement indicated that Briggs "cannot return [to work] in his condition." Without objective evidence, however, this statement appears inconclusive as to whether Briggs can perform sedentary activities. This is especially true considering that a month earlier, on December 2, 2002, Dr. Quigley wrote that, despite Briggs's pain, he "likes to drive no more than 5 miles."

their diagnosis.

Dr. Anchor's diagnosis found that Briggs was "totally disabled."  His diagnosis, however,  was supported by the objective evidence of a low ejection fraction.  Nevertheless, after Liberty twice requested that Dr. Anchor respond to the IME results finding that Briggs had a sedentary functional capacity, Dr. Anchor answered with "three mistakes."  None of the three mistakes, however, commented on the IME results that Briggs had a sedentary functional capacity.  Therefore, Liberty reasonably concluded that Dr. Anchor's failure to comment suggested that he agreed with the IME's conclusion that Briggs had a sedentary capacity.

Even considering the facts in the light most favorable to Briggs, this case amounts to Briggs's treating physicians and the non-treating physicians having conflicting clinical findings.  Although Liberty cannot arbitrarily ignore the opinions of Briggs's treating physicians, it reasonably may choose to value the opinions of its own medical consultants over his treating physician.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834  (2003) (holding that ERISA does not require plan administrators to give special deference to treating physicians' opinions, although administrators may not arbitrarily refuse to credit them).  Here, an independent medical examiner and an outside peer reviewer reviewed Briggs's medical records in detail.  Dr. Silver, who reviewed Briggs's medical records, concluded that Briggs was able to perform sedentary work functions.  Dr. April, who actually physically examined Briggs, arrived at the same conclusion.  Dr. Silver and Dr. April's conclusions were not rendered perfunctory.  Quite the contrary, Dr. Silver and Dr. April's conclusions were grounded in the aforementioned objective evidence, and their decision was presented to Plaintiff with the explanation that he could so return to his duties as a SIS Analyst

in the limited capacity of performing sedentary functions.[9]  Based on these aforementioned testimony and objective evidence of a disabling impairment, Liberty properly concluded that, with the appropriate sedentary modifications, Briggs was able to perform the duties of a SIS Analyst.

In addition to the testimony of medical physicians, Liberty's decision that Briggs was capable of performing sedentary duties was also based upon video surveillance.  From April 14, 2003 to May 3, 2003, investigators observed Briggs performing various tasks, such as:  walking with and without a cane, entering and exiting his vehicle, driving his vehicle, carrying various items including a trash bag, opening the hood of his vehicle, and leaning forward to check his oil.  Although not dispositive, when coupled with the testimony of the medical physicians, this evidence justifies Liberty's conclusion that Briggs was capable of performing his occupation.

In sum, the evidence supports Liberty's discretionary decision that Briggs did not provide sufficient evidence of a disability under the Policy.  While Liberty has a conflict of interest, based on the reasons

---

[9] Plaintiff cites a series of cases which rely upon the precedent of Laser v. Provident Life & Accident Ins. Co., 211 F.Supp.2d 645, 657 (D. Md. 2002) (The "treating physician rule" requires the fact finder to defer to "the expert judgment of a physician who has observed the claimant's medical condition over a prolonged period of time. . . absent persuasive contradictory evidence.").  Noticeably, the Fourth Circuit has never adopted the so-called "treating physicians rule," and therefore Liberty could not have abused its discretion in accepting the conclusions of Dr. April and Dr. Silver over those of Briggs's own treating physicians.  Nevertheless, even assuming the "treating physicians rule" applied here, Briggs is not entitled to relief.  In Laser, the Court found that a denial of ERISA benefits decision, in the context of an administrator laboring under a conflict of interest contains, contained no "substantial evidence" where the defendants' own staff relied upon "ipse dixit conclusion[s]."  211 F.Supp.2d at 656.  Unlike Laser, in the instant case, Defendants had Briggs physically examined by Dr. April and his medical records were independently examined by Dr. Silver.  Even more importantly, Dr. Silver recognized the diagnosis of Briggs's treating physicians, but nevertheless, found that Briggs's treating physicians *failed* to consider whether Briggs was capable of performing sedentary activities.  Therefore, this case is not one where the plan administrator "completely ignored the treating physician's opinions," but rather a case where Dr. Silver considered a factor not mentioned by Briggs's treating physicians.

articulated above, this Court concludes that Liberty's decision was nevertheless "consistent with an exercise of discretion by an [administrator] acting free of the interests that conflict with those of the beneficiaries." Ellis, 126 F.3d at 233.

        D.        Analysis of Marriott's Claim to Summary Judgment

Additionally, the Court notes that summary judgment should be granted in favor of Marriott on an independent ground.  Section 7 of the Policy provides, in relevant part:

> Liberty shall possess the authority, in its sole absolute and final discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

The plain terms of this policy make it abundantly clear that Liberty has the sole discretionary decision-making authority over interpreting the Policy and eligibility for disability benefits.  As Briggs challenges the decision denying him ERISA benefits, Marriott is clearly not a proper party defendant in this ERISA benefits action.  See Garren v. John Hancock Mut. Life Ins. Co., 114 F.3d 186, 187 (11th Cir. 1997); Earnest v. Metro. Life Ins. Co., 291 F.Supp.2d 1327, 1337-38; Hunter v. Metro. Life Ins. Co., 251 F.Supp.2d 107, 112-13 (D.D.C. 2003), *aff'd* 2003 WL 22240321 (D.C. 2003).

## CONCLUSION

For the aforementioned reasons, Defendants' Motion to Seal Exhibits is GRANTED, and Defendants Motion for Leave to Submit One Paper Copy of Exhibits is DENIED-AS

MOOT.   Additionally, this Court GRANTS Defendants' Motion for Summary Judgment.   This

case is hereby closed.   An appropriate Order shall follow.


May 6, 2005                                                      /s/
Date                                                Alexander Williams, Jr.
                                                    United States District Judge